UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| RENEE COWIE and STEPHEN COWIE, ) | |
| ) | |
| *Plaintiffs,* ) | |
| v. ) | No. 1:07-cv-63 |
| ) | *Edgar / Carter* |
| STATE FARM FIRE & CASUALTY ) | |
| COMPANY, ) | |
| ) | |
| *Defendant.* ) | |

**MEMORANDUM**

Plaintiffs Renee Cowie and Stephen Cowie bring this action for breach of contract and violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.* ("TCPA"). Defendant State Farm Fire & Casualty Company ("State Farm") moves for partial summary judgment dismissal of Plaintiffs' TCPA claim. [Court Doc. No. 86]. Plaintiffs have failed to oppose the motion for partial summary judgment.

Plaintiffs brought their original complaint for breach of an insurance contract in the Circuit Court of Genesee County, Michigan on October 26, 2006. State Farm subsequently removed the action to the United States District Court for the Eastern District of Michigan. Plaintiffs' original complaint stated that they were residents of Genesee County, Michigan. [Court Doc. No. 13-3, Complaint]. According to the Complaint, State Farm is incorporated in Illinois, but is licensed to conduct business in Michigan. *Id.*

State Farm moved in the Michigan district court for a transfer of venue to this court because the Plaintiffs' boat was destroyed in Chattanooga, Tennessee while they resided in Tennessee. [Court Doc. No. 13]. State Farm also issued the relevant insurance policy in

Tennessee. The Michigan district court granted State Farm's motion for a transfer of venue to this court. *Id.*

Plaintiffs have since amended their original complaint on two separate occasions. *See* [Court Doc. Nos. 34, 59]. Plaintiffs' Third Amended Complaint [Court Doc. No. 59] alleges that Plaintiffs owned a 24-foot Stingray boat, which was destroyed by fire in Tennessee. Plaintiffs assert that State Farm insured the boat through a boat owner's insurance policy, Policy No. 42-J7-2868-8 (the "Policy"), which provided for the replacement cost of the boat upon a loss caused by fire. Third Amended Complaint, ¶ 5. Plaintiffs allege that they complied with their contractual obligations under the Policy, but State Farm denied their claim. *Id.* at ¶¶ 9-11. Plaintiffs assert that State Farm's failure to pay for the loss of their boat due to fire constitutes a breach of contract. They further assert that State Farm engaged in deceptive practices by relying on an erroneous expert report that suggested the fire was caused by arson attributable to the Plaintiffs when the company knew the expert report was in error.

State Farm answered the Third Amended Complaint and also brought a counterclaim for declaratory judgment against Plaintiffs. [Court Doc. No. 62]. The counterclaim seeks a declaratory judgment from this court that, among other things, the Plaintiffs are not entitled to any payment under the Policy.

**I.     Background**

Based on the record provided by State Farm, the following facts appear to be undisputed by the parties. State Farm issued the Policy to Stephen and Renee Cowie on June 27, 2005. [Court Doc. No. 62-2]. The Policy was in effect on October 28, 2005. The Policy covered the Plaintiffs' 24-foot 2005 Stingray Cruiser.

The Policy contains a number of conditions pertaining to coverage. It states in relevant part:

> Intentional Acts. If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void and we will not pay you or any other insured for this loss.

Policy, Section I, Conditions, ¶ 12. The Policy further provides that

> Coverage L and Coverage M do not apply to bodily injury or property damage:
> a. which is either expected or intended by an insured;
> b. to any person or property which is the result of willful and malicious acts of an insured; . . .

Policy, Section II, Exclusions, ¶ 1. Concealment and fraud are further excluded from coverage:

> Concealment or Fraud. This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after the loss.

Policy, Section I and Section II - Conditions, ¶ 3.

In October 2005, Plaintiffs were mooring the boat covered under the Policy at the Lakeshore Marina on the Tennessee River in Chattanooga, Tennessee. *See* [Court Doc. No. 86-3, Affidavit of James Whitmire "Whitmire Aff."]. At 6:46 a.m. on October 28, 2005 a witness reported a fire at the Lakeshore Marina to the Chattanooga City Fire Department. *Id.* Captain James Whitmire responded to the scene of the fire.

Capt. Whitmire interviewed Mr. Cowie, the owner of the boat on which the fire originated. He summarized his findings in an Initial Investigator Report. [Court Doc. No. 86-3]. Capt. Whitmire's report indicates that Mr. Cowie informed him that he had not been on the boat since two weeks prior to the fire. At that time, Mr. Cowie asserted that he was removing a decal from the rear of the boat. While removing the decal, Mr. Cowie used an electrical, thermostatic

controlled heater. After he was through using the heater, he placed it at the base of the stairs in the cutty cabin. The heater connected to a heavy-duty electrical cord and was plugged into an electrical outlet beside the sink in the cabin. *Id.* Mr. Cowie indicated that he did not know if he had unplugged the heater prior to the blaze.

By the time the firefighters arrived on the scene, the Cowies' boat was already engulfed in flames. Capt. Whitmire's report states:

> Due to the boat being in the water and filled with water and foam no samples was [sic] taken until the boat was dry-docked. Once the boat was drained the area of origin appeared to be in the cutty cabin at the base of the steps going into the cabin. An electric heater connected to an industrial type extension cord was found melted to the carpet. In front of the heater laid [sic] a roll of paper towels with an odor of what appeared to be gasoline.

[Court Doc. No. 86-3]. The record demonstrates that the fire damaged at least one neighboring boat and part of the marina. [Court Doc. No. 107].

Mr. Cowie testified in his deposition that he was on the boat the night before the fire around 6:30 p.m. [Court Doc. No. 86-5, Deposition of Stephen Michael Cowie II ("S. Cowie Dep. II"), pp. 144-145]. He also testified that he brought gasoline on the boat in a gallon jug that had previously held antifreeze coolant and that was three-quarters of the way full. *Id.* at 145; [Court Doc. No. 86-4, Deposition of Stephen M. Cowie ("S. Cowie Dep. I"), p. 64]. He had also placed a space heater on the boat prior to the fire and brought several rolls of paper towels with him the night before the fire. S. Cowie Dep. II, p. 145. On Thursday night October 27th, Mr. Cowie admitted that he used the electric heater on the boat. S. Cowie Dep. I, p. 77-78. He set the heater in the cabin at the base of the stairs and could not recall whether he unplugged it on Thursday night. *Id.* at 78. He further testified that he did not recall if the heater was hot when he set it down in the cabin. *Id.* at 81.

It is also clear from the record that Mr. Cowie was the last known person on the boat prior to the fire that erupted on the morning of October 28, 2005. Mr. Cowie testified in his deposition that he returned to the boat at about 5:00 a.m. on the morning of the fire, allegedly to leave some clothes on the boat so that he could return there following his work day. S. Cowie Dep. I, pp. 85-86. The Cowie family planned to leave on a fall cruise that weekend, and following their work day on Friday, they planned to meet at the marina to "help with the boat and party on Friday night along with all the rest of the people that [they hung] around with . . ." *Id.* at 86. Mrs. Cowie and the Cowie's daughter waited in the car on Friday morning while Mr. Cowie boarded the boat allegedly to place his clothes in the cabin. *Id.* at 87. Mr. Cowie did not wish to return with his wife and daughter to their apartment following work to take a shower; instead, he testified that he wanted his wife to drop him off at the boat directly after work. *Id.* at 86.

On October 31, 2005, an expert fire investigator, Jerry Carter, examined the Cowie's damaged boat. Mr. Carter worked with Technifire in Chattanooga, Tennessee and had served as the Assistant Fire Chief for the City of Red Bank for many years. [Court Doc. No. 86-7]. Mr. Carter prepared a report regarding the cause of the fire. [Court Doc. No. 86-6, ("Technifire Report")]. Mr. Carter's report summarized the origin of the fire:

> The fire began at the floor of the cabin area more especially at the galley adjacent to the bottom of the stairs, cabinet for the sink and stove and the entrance to the head. Located in this area were an electric space heater and a roll of paper towels positioned on the floor in front of the electric space heater. Flame development was to the paper towels and subsequently an introduced ignitable liquid, which was identified by the laboratory as gasoline.

Technifire Report, p. 3. Mr. Carter determined the cause of the fire to be incendiary. His report indicated that factors contributing to his conclusion included the location of the paper towels

directly in front of the space heater, evidence that the space heater was "connected to a viable electrical source and was operable at the time of the fire[']s inception" and evidence of gasoline from a debris sample of the paper towels. *Id.* Mr. Carter's report notes the elimination of other possible logical causes for the fire, including such causes as appliances or electrical failures of the shoreline electrical power, gasoline leaks from the fuel tank, or other accidental causes. *Id.* at 4.

Following Mr. Carter's investigation, State Farm also obtained an expert report from Eaton Engineering Company dated January 4, 2006. [Court Doc. No. 86-6, p. 39 "Eaton Engineering Report"]. Employees of Eaton Engineering examined the Cowies' boat on November 11, 2005. *Id.* Dr. Eaton's report to State Farm includes the following summary:

> The fire in the cabin cruiser was not caused by an appliance in the galley. . . . . The fire did not originate from the wiring or electrical equipment inside the compartment below the sink. The fire was not caused by a problem with the main electric panel, and the receptacle below the sink did not cause the fire.
> The long, orange extension cord [was] used to supply power to the portable electric heater; this long extension cord was coiled on the galley floor. It was plugged into the duplex receptacle mounted in the wall below the 120-Volt panel. The receptacle was normal; also, the plug on the extension cord was normal.
> Much of the long extension cord had become fused to carpet and plastic items that melted in the fire and later resolidified. It was not possible to examine the extension cord in areas where it was bound in a plastic mass. Nevertheless, at no place along the length of the extension cord in the mass was there evidence of a local hot spot or other problem involving the extension cord. However, there had been an electrical short in the extension cord near the end of the cord where it plugged into the receptacle. The location of the short was in a location where the cord was exposed to fire above floor level and near the wall below the sink.
> Inspection of the electrical short in the extension cord showed no evidence of an unusually severe fault; this short did show that the extension cord was energized when the fire began. The nature of the physical damages to the electrical conductors at the fault site and the location of the fault within the cabin indicated that this short had tripped the branch circuit breaker and was a fire-caused short. This extension cord short established that the fire did originate inside the cabin before spreading to the helm and stern. . . .

> The portable electric heater was inspected during the burned boat examination at Veristar. The electric heater had been attacked by an intense external fire; it was generally much cooler inside the heater cabinet than outside. The on/off switch was destroyed, and the pre-fire position of this switch could not be determed [sic]. However, there was no evidence to indicate that the heater was operating when the fire occurred. . . . The portable electric heater did not malfunction and was not the cause of the fire. . . .
> To conclude, based on inspection of the 2005 Sea Ray cabin cruiser, the origin of the fire was verified as being inside the cabin in the vicinity of the galley. A portable electric heater in the galley did not cause the fire.

*Id.*

On January 18, 2006 Dr. Eaton sent a letter for Mr. Carter regarding the Eaton Engineering Report and clarifying his conclusions in the report. [Court Doc. No. 86-6, p. 45]. The letter states in relevant part:

> In response to a telephone conversation earlier today, I am writing to clarify an observation in my engineering report of 4 January 2006.
> On page 5 at the end of the first paragraph, it states, "However, there was no evidence to indicate that the heater was operating when the fire occurred."
> The intention of that statement was to note the observation that while the heater cabinet was being attacked by external fire, the resistance heating element was not in operation, i.e., was not being heated by electrical current flow.
> Based on the examination of the portable heater in the galley and the examination of the boat, the heater was connected to a live electrical source when the fire occurred. That is, the heater was energized, because it was plugged into an extension cord that was plugged into a wall receptacle. The physical evidence clearly shows that, when the fire occurred, electrical power was on to the extension cord and to the portable heater as well.
> Fire damages to the heater prohibited a determination of the automatic thermostatic switch setting. If the heater switch were turned to a controlled temperature setting, it would have came-on [sic] and operated whenever the thermostat called for heat.
> Because the portable heater had a thermostatic control switch, it could come on at any time the galley temperature cooled to a temperature that would cause the automatic thermostat to be switched on. Based on the boat examination, the portable heater in the galley could have been operating and then switched off, because the thermostat was subsequently heated by a fire in progress in the galley area.
> The statement in paragraph 1 on page 5 notes that while the heater was being severely damaged by fire exposure, the heating element was not energized.

>Nevertheless, the heater was operational and could have been operating when the fire started.

*Id.*

The record further demonstrates that the Cowies had financial incentive to start a fire on their boat to obtain insurance proceeds. By June 1, 2005 the entire Cowie family had moved to Chattanooga, Tennessee. S. Cowie Dep. I, p. 13. The family realized around $52,000 on the sale of their home in Michigan, and Mr. Cowie put about $47,000 of that amount into a money market account upon the move to Tennessee. *Id.* at 15-16. The Cowies moved from Michigan to Chattanooga so that Mr. Cowie could take a position he had been offered at a Nissan dealership in Chattanooga. S. Cowie Dep. II, pp. 138-139. However, Mr. Cowie's salary expectation did not materialize. *Id.* at 139. The dealership only paid him his expected salary of $1,000 per week for about six weeks, even though Mr. Cowie believed the dealership had assured him it would pay him at that level for six months to a year. *Id.* at 140-141. When the dealership informed Mr. Cowie it would no longer pay him his expected salary, but would pay him only on commission, Mr. Cowie terminated his employment. *Id.* at 141. His employment with the dealership ended in mid-August of 2005. S. Cowie Dep. I, pp. 49-50. Mr. Cowie did not have any income from the time he ended his employment with the Nissan dealership until late September after he began working for a Ford dealership. *Id.*

In June of 2005, Mr. Cowie put down $15,000 from the money market account on the boat at issue in this action and obtained a mortgage for the remaining amount. S. Cowie Dep. I, p. 17; Whitmire Aff. He also spent $20,000 to purchase a restaurant in Chattanooga known as the "Chef Salad" with proceeds from the money market account. *Id.* at 19-20. Mrs. Cowie testified that the couple withdrew another $7,000 from the money market account in June of

2005, but Mrs. Cowie could not remember the purpose of that money. [Court Doc. No. 86-9, Deposition of Renee Sharon Cowie ("R. Cowie Dep."), p. 50]. Mrs. Cowie had not been employed for at least five years before her move to Chattanooga. [Court Doc. No. 86-10]. Prior to that time, she worked as a waitress at Big Boys. *Id.*

Although Mr. and Mrs. Cowie both worked for their restaurant after it opened on September 1, 2005, the business never made a profit, and the Cowies never received any wages or salary from its operation. S. Cowie Dep. I, pp. 49, 31-32. The Cowies' annual income dropped substantially from a total annual income of $52,000 in 2004 to a total income of less than $30,000 in 2005. *Id.* at 11; [Court Doc. No. 86-12].

The day before the fire the Plaintiffs' money market account had a balance of $0.00. [Court Doc. No. 86-11, Ex. 6]. Their checking account had a balance of $9.87 on October 26, 2005. [Court Doc. No. 86-11, Ex. 5]. The Plaintiffs admitted in depositions and interviews that they had significant monthly expenses for rent, medications for Mr. Cowie, their boat payment, utilities, cell phones, and cable television. R. Cowie Dep., pp. 47-48; Whitmire Aff.; [Court Doc. No. 86-13]. In addition, in February of 2006, a Hamilton County, Tennessee Grand Jury indicted Mr. Cowie for arson with respect to the fire on the Cowie boat. S. Cowie Dep. II, pp. 149-150. On May 1, 2006 State Farm issued a claim denial notice. Third Amended Complaint.

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the

Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

**III.    Analysis**

State Farm moves for partial summary judgment solely on Plaintiffs' TCPA claim.  The TCPA provides that:

> [a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use of employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn. Code Ann. § 47-18-109(a)(1).  The TCPA lists a range of various specific unfair and deceptive practices in Tenn. Code Ann. § 47-18-104.

While Tenn. Code Ann. § 47-18-104 provides a list of unfair and deceptive practices, it also contains a "catch-all" provision that states that "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person" is unlawful.  Tenn. Code Ann. § 47-18-104(b)(27).  The Tennessee Supreme Court has held that this catch-all provision may apply to insurance companies and that the TCPA does not explicitly exempt insurance companies from its provisions.  *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 922, 925 (Tenn. Sup. Ct. 1998) (citing Tenn. Code Ann. § 47-18-111).  The court in *Myint* determined that exempting insurance companies from the coverage of the TCPA would frustrate the purposes of the Act.  *Id.* at 925-26.  It held that "[w]e consider the Insurance Trade Practices Act, the bad faith statute, and the Consumer Protection Act as *complementary* legislation that accomplishes different purposes, and we conclude, accordingly, that the acts and practices of insurance companies are generally subject to the application of all three."  *Id.* at 926.

The Tennessee Supreme Court then addressed whether the actions alleged by the plaintiffs, the defendant insurer's denial of their claim due to its suspicion that the plaintiffs had

engaged in arson in violation of their insurance policy, stated a claim under the TCPA. *Myint*, 970 S.W.2d at 923, 926. The parties stipulated that the fire that caused substantial damage to the property at issue had been set intentionally, but the plaintiffs denied that they participated in the arson. *Id.* at 923. The Tennessee Supreme Court held:

> While the sale of a policy of insurance easily falls under this definition of "trade" and "commerce," we conclude that Allstate's conduct in handling the Myints' insurance policy was neither unfair nor deceptive. The record reveals no evidence of an attempt by Allstate to violate the terms of the policy, deceive the Myints about the terms of the policy, or otherwise act unfairly. It is apparent that the denial of the Myints' claim was Allstate's reaction to circumstances which Allstate believed to be suspicious. Consequently, Allstate's conduct does not fall within the purview of the [TCPA], and the Myints are not entitled to the benefits of treble damages and attorney's fees recoverable under the Act. The trial court's dismissal of the Consumer Protection Act claim and the subsequent approval of that dismissal by the Court of Appeals is therefore affirmed.

*Id.* at 926.

Other state and federal court decisions have made clear that for the TCPA to apply to the denial of insurance claims, the insured must allege that the insurer violated the terms of the policy, deceived the insured about the terms of the policy or acted unfairly in some other way. *See e.g., Nautilus Ins. Co. v. The In Crowd, Inc.*, 2005 WL 2671252, No. 3:04-0083 (M.D. Tenn. Oct. 19, 2005); *Parkway Assoc., LLC v. Harleysville Mutual Ins. Co.*, 129 F. App'x 955, 960-61 (6th Cir. 2005) (affirming district court's award of summary judgment where plaintiff failed to allege that defendant insurer misled or deceived it). Further, a mere denial of an insurance claim, absent any deceptive, misleading of unfair act does not violate the TCPA. *See e.g., Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007) (affirming award of summary judgment for insurer on plaintiff's TCPA claim where at worst insurer's conduct amounted to an "erroneous denial" of a claim); *Stooksbury v. American Nat. Property and Cas.*

*Co.*, 126 S.W.3d 505, 520 (Tenn. Ct. App. 2003) (reversing trial court award of damages pursuant to the TCPA where "no material evidence" existed "to support the jury's conclusion that Defendant engaged in deceptive or unfair acts"); *Ginn v. American Heritage Life Ins. Co.*, 173 S.W.3d 433, 445-46 (Tenn. Ct. App. 2004) (reversing jury verdict on plaintiff's TCPA claim where insurer simply maintained good faith, although mistaken, belief that plaintiff materially misrepresented her husband's health).

Following the *Myint* decision, a federal district court in Tennessee held that the TCPA applied to deceptive or unfair trade practices in the handling of claims. *See Sparks v. Allstate Ins. Co.*, 98 F.Supp.2d 933, 935 (W.D. Tenn. 2000). In *Sparks*, the plaintiff filed a lawsuit for breach of contract and violation of the TCPA against her insurance company for its alleged bad faith refusal to pay her insurance claim. *Id.* at 934. She alleged that the insurer wrongfully denied her claim after a fire destroyed her home. *Id.* The defendant denied her claim alleging that the plaintiff set fire to her own home or wrongfully procured the fire. *Id.* at 934-35. The complaint asserted that the insurer's denial of her claim was deceptive and unfair because the insurer denied the claim based on alleged arson when there was evidence in the Fire Marshal's report that the cause of the fire was a short circuit in fixed wiring. The insurer moved to dismiss the plaintiff's claim under the TCPA pursuant to Fed.R.Civ.P. 12(b)(6). The district court denied the motion to dismiss. It noted that:

> Having decided that the TCPA may in some circumstances apply to claims handling procedures, the court holds that the complaint in the present case is sufficient to allege a claim under the TCPA and thus dismissal under the standard set forth in rule 12(b)(6) is improper. . . . because plaintiff alleges that Allstate had clear evidence when it denied her claim that the cause of the fire was an electrical short, not arson. Taking plaintiff's allegations as true, as the court must, and drawing all inferences from those allegations in her favor, the court finds that if defendant had clear evidence that there was no arson and yet violated the terms

of the policy by refusing to pay plaintiff's claim, that action could violate the TCPA.

98 F.Supp.2d at 938.

State Farm's denial of Plaintiffs' claim is more analogous to the insurer's actions in *Myint* than to the Plaintiffs' allegations against the insurer in *Sparks*. In this action the record reveals that State Farm received reports from two experts demonstrating that arson could have been the likely cause of the fire on the Cowie's boat. The Technifire report demonstrates that the fire began in the cutty cabin where a roll of paper towels had been doused with gasoline and placed in front of a thermostatically controlled heater that was plugged into the wall. The evidence also demonstrates that the Eaton Engineering Report initially indicated that a malfunction in the heater did not cause the fire. However, Dr. Eaton, the author of the report, clarified in a letter to the Technifire investigator that the report's conclusions did not eliminate the possibility that the heater was working and started the fire, but due to its thermostatic control, turned off as the room heated up due to the fire. *See* [Court Doc. No. 86-6, pp. 45-46].

Prior to its denial of the Plaintiffs' claim, a Tennessee grand jury indicted Mr. Cowie for arson. Further, the evidence shows that the Plaintiffs were in dire financial straits at the time of the fire, thus giving them a motivation to seek the insurance proceeds on their boat. The record is clear that, like the insurer in *Myint*, State Farm had reasonable cause to be suspicious of the validity of the Plaintiffs' claim. The Policy clearly excludes intentional acts from insurance coverage. The record in this case, as in *Myint*, reveals "no evidence by [State Farm] to violate the terms of the policy, deceive the [Plaintiffs] about the terms of the policy, or otherwise act unfairly." *See* 970 S.W.2d at 926. Rather, the denial of Plaintiffs' claim in this action was State Farm's "reaction to circumstances which [State Farm] believed to be suspicious." *Id.*

Plaintiffs have earlier argued in response to State Farm's motion to dismiss that a recent unreported decision by a Tennessee appellate court demonstrates that they state a cause of action pursuant to the TCPA. *See Gaston v. Tennessee Farmers Mut. Ins. Co.*, No. E2006-01103-COA-R3-CV, 2007 WL 1775967 (Tenn. Ct. App. June 21, 2007). In *Gaston* the plaintiff suffered injuries in a car accident. Her insurance policy contained a provision that stated that no under-insured coverage existed for injury or property damage if the insured settled a claim of injury without the defendant insurer's written consent. *Id.* at *2. The plaintiff settled a claim for her injuries with the other motorist's insurer, and her insurance representative informed her that the defendant insurer would not pay the under-insured motorist coverage under her policy because she breached the terms of the policy by settling with the other motorist's insurer. *Id.* However, the insurance representative had received a demand letter the plaintiff had sent to the other motorist's insurer, he knew the plaintiff had accumulated substantial medical bills, and he knew that the plaintiff had suffered severe injuries in the accident. He also knew that the plaintiff would likely file a claim for the under-insured motorist coverage, and that his employer, the insurer had exposure for the coverage. *Id.* However, the insurance representative did not contact the plaintiff and did not warn her that her under-insured coverage might be in jeopardy if she settled with the other motorist's insurer. *Id.*

The Tennessee appellate court determined that the defendant insurer's conduct did not fall explicitly into the deceptive behavior required in the TCPA's catch-all provision, Tenn. Code Ann. § 47-18-104(b)(27). *Id.* at *11. However, it found that violations of the TCPA were not limited to only those acts listed separately in Tenn. Code Ann. § 47-18-104(b). *Id.* The court noted that "there can be unfair or deceptive acts or practices other than those specifically

set forth in T.C.A. § 47-18-104(b)." *Id.* at *11. The court then found that:

> The Supreme Court in *Gaston I* stated that one could reasonably conclude that [the defendant insurer] had acted in an "unfair" manner in its dealings with the plaintiff:
> Neither [the insurance representative] nor anyone else at [defendant] notified or informed [plaintiff], who was not represented by counsel, that her effort to settle with [the other motorist's insurer] would prohibit her from collecting under her own policy. In our view, a jury could reasonably conclude that [defendant's] conduct was unfair or deceptive under the TCPA.

*Id.* (quoting *Gaston v. Tennessee Farmer's Mut. Ins. Co.*, 120 S.W.3d 815, 822 (Tenn. Sup. Ct. 2003)). The court of appeals held that the defendant's unfair behavior in withholding relevant information from the plaintiff about her coverage when it knew she was contemplating settling her claim with the other motorist's insurer constituted unfair behavior that violated the TCPA. *Id.*

This action is distinguishable from *Gaston*. There is no evidence in the record demonstrating that State Farm had information that would affect Plaintiffs' insurance claim positively that they did not share with Plaintiffs. There is evidence in the Eaton Engineering Report that the electric heater did not start the fire. However, only a few weeks later, and several months before the claim denial, Dr. Eaton clarified his report indicating that the heater was operational and plugged in and could have been running when the fire started. This information, combined with a lack of other explanations regarding the source of the fire, the evidence of paper towels soaked in gasoline and left in front of the heater, Mr. Cowie's admitted presence on the boat the morning of the fire, his indictment for arson, and the Cowie's financial situation all indicate that State Farm had reason to be suspicious that the Cowies played a role in starting the fire. State Farm's denial of Plaintiffs' claim thus was neither deceptive nor unfair. Nor did its action violate the terms of the Policy, which clearly excludes coverage for intentional acts.

Therefore, the Cowies have failed to state a cause of action against State Farm for violation of the TCPA.  This claim will be DISMISSED.

**IV.    Conclusion**

As stated *supra*, the Plaintiffs' claim for violation of the TCPA will be **DISMISSED**.  A separate order will enter.


        */s/ R. Allan Edgar*
        R. ALLAN EDGAR
   UNITED STATES DISTRICT JUDGE